RECEIPT # 5715
AMOUNT $
SUMMONS ISSUED 1
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE 2-23-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - x

ASPEN TECHNOLOGY, INC.,          :

            Plaintiff,          :          Civil Action
                                                             No.
         v.          :          **04 - 11830 PBS**

F/V SOFTWARE, L.L.C.,          :

         Defendant.          :          **MAGISTRATE JUDGE** Alexander

- - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Aspen Technology, Inc. ("Aspen"), by its undersigned attorneys, brings this action against Defendant F/V Software, L.L.C. ("Defendant"), and alleges upon knowledge with respect to itself and its own acts and upon information and belief with respect to all other matters, as follows:

### Nature Of The Action

1.      By this action, Aspen seeks a declaratory judgment to settle a live controversy between the parties relating to Aspen's performance of certain obligations under a Registration Rights Agreement ("RRA"), executed on June 15, 2001 between Aspen and Defendant (among others), in connection with an asset-purchase transaction in which Defendant received nearly 100,000 shares of unregistered Aspen common stock. (A copy of the RRA is attached hereto as Exhibit A and incorporated herein by reference.)

2.      In the RRA, Aspen agreed to "provide for certain arrangements with respect to the registration of those shares under the Securities Act of 1933." The relevant "arrangements" are set forth in §§ 2.1 and 2.3 of the RRA. Until the stock registration was declared "effective" by the Securities and Exchange Commission

("SEC"), which occurred on December 14, 2001, Defendant could not sell its shares on the public markets.

   3.  On August 11, 2004, Aspen received a letter from a Louisiana attorney named Eugene G. Taggart, purporting to represent the Defendant. In the letter, Mr. Taggart stated his firm had been asked "to recover damages [Defendant] sustained from the failure of Aspen Technology, Inc. to perform a certain Registration Rights Agreement dated June 15, 2001" and that the "failure of Aspen Technology, Inc. to perform its obligations under the Registration Rights Agreement caused significant monetary damages to [Defendant]."

   4.  Upon information and belief, Defendant appears to be contending that the registration of Defendant's shares took longer than expected; that this extra delay was Aspen's fault; and that, as a result, Aspen now owes Defendant the difference between the price at which Defendant ultimately sold the stock and some other, presumably higher, price at which the stock would have been trading had the registration been declared effective when Defendant wanted.

   5.  Aspen flatly denies these charges and believes Defendant's apparent theory of damages is unfounded.

   6.  For example, upon information and belief, Defendant in fact made a substantial profit on the transaction, whereas Aspen lost money and was forced to write off the entire deal.

   7.  Aspen seeks to resolve this dispute now.

   8.  Accordingly, Aspen seeks a declaratory judgment that:

     (i)  Aspen fully performed its material obligations in the RRA;

2

(ii)     Aspen did not breach the RRA; and

(iii)    Any alleged "failure" on the part of Aspen to perform an

obligation under the RRA did not cause any of Defendant's alleged "damages."

## Parties

9.     Aspen is a publicly-traded company incorporated under the laws of the State of Delaware with its principal place of business in Cambridge, Massachusetts. It is a supplier of software and services to the process industries, such as chemical and energy. Aspen's solutions are used by companies to run their plants and supply chains.

10.     Upon information and belief, Defendant is a private equity investment holding company organized under the laws of the State of Louisiana with its principal place of business in New Orleans, Louisiana.

11.     Upon information and belief, Defendant was and is created and controlled by Frantzen/Voelker Investments, L.L.C., a private equity investment group.

## Jurisdiction

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201. The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is diversity of citizenship.

13.     Defendant is subject to personal jurisdiction within the Commonwealth of Massachusetts because, among other reasons, it has transacted business within Massachusetts; it has derived substantial benefit and revenue from contracts negotiated in, executed in, and governed by the laws of the Commonwealth of Massachusetts; and it has threatened litigation against a Massachusetts resident while in Massachusetts.

3

## Venue

14.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(a).

## Facts

### *March 2001 - June 14, 2001: The Negotiations*

15.     In the spring of 2001, representatives from Aspen and Defendant,
among others, initiated negotiations for the possible purchase by Aspen of one of the
business units (the "PAI Business") of a company called Computer Processes Unlimited,
LLC ("CPU"), which at the time was controlled by Defendant's parent company
Frantzen/Voelker Investments, L.L.C. and another venture capital company named
Advantage Capital Management.

16.     To lead the negotiations, the Management Committee of CPU
appointed David Erath, one of Frantzen/Voelker Investments, L.L.C.'s top executives and
a principal owner of Defendant.

17.     Mr. Erath is a sophisticated businessperson, seasoned negotiator
and has years of investment experience. Over the course of his career, Mr. Erath has
negotiated deals nearing half a billion dollars in value.

18.     Also representing Defendant in the negotiations was the venture
capitalist Crichton Brown of Advantage Capital Management.

19.     Also representing Defendant in the negotiations was the law firm
of Sher Garner Cahill Richter Klein McAlister & Hilbert, L.L.C. ("Sher Garner"), one of
the top law firms in New Orleans. Among Sher Garner's many areas of expertise is
securities law where, upon information and belief, it has experience in public offerings,
private placements and compliance with complex state and Federal laws and regulations,

4

as well as representing clients in proceedings before state and Federal regulatory agencies.

20.    Sher Garner was the primary contact for Aspen's attorneys in negotiating the RRA.

21.    The negotiations themselves were intense and compromises were made on both sides. Many drafts of the agreements were exchanged, including at least nine drafts of the RRA.

22.    Prior to the closing, Defendant signed and submitted an "Investment Representation Letter," under which it represented that it had "adequate opportunity to obtain from representatives of Aspen such information about Aspen as is necessary for the [Defendant] to evaluate the merits and risks of [Defendant's] acquisition of the Shares"; that it was an "'accredited investor' as defined by Rule 501(a) under the Securities Act [of 1933]"; and that it had "sufficient expertise in business and financial matters to evaluate the risks involved . . . and to make an informed investment decision with respect to [the] acquisition."

23.    Between March 1, 2001 and June 14, 2001, prior to the closing of the transaction, Aspen common stock was trading between a high of $30.00 per share and a low of $11.88 per share.

### *June 15, 2001: The Closing*

24.    On June 15, 2001, the transaction closed and Aspen purchased the PAI Business from Coppermine LLC ("Coppermine"), a wholly-owned subsidiary of CPU created for purposes of the acquisition.

25.    The purchase itself was embodied in a "Membership Interest Purchase Agreement" ("Purchase Agreement"), signed by the three corporate entities

5

Aspen, CPU and Coppermine. Defendant was not a party to the Purchase Agreement, nor was it a contemplated beneficiary.

26.    Under the terms of the Purchase Agreement, CPU conveyed all of its interest in Coppermine to Aspen in exchange for approximately 400,000 unregistered shares of Aspen common stock. Defendant received Aspen unregistered stock as "designees for CPU" as a "distribution, without consideration."

27.    Another of the agreements executed at the closing was the RRA, to which Aspen and Defendant both were parties.

28.    By its terms, the RRA is governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. See RRA § 4.4.

29.    In addition, the RRA is a fully-integrated contract which, by its terms, "constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof." See RRA § 4.3.

30.    Under the RRA, Aspen agreed to "provide for certain arrangements with respect to the registration of [the shares] under the Securities Act of 1933."

31.    To the extent Aspen made any representations or promises to Defendant about whether or when the registration statement for the shares received by Defendant would be declared effective by the SEC, or Aspen's ability to have the registration statement declared effective, those representations or promises would have been contained in the RRA.

6

32.    In relevant respects, the RRA states as follows:

1.  CERTAIN DEFINITIONS

\*    \*    \*

"REGISTRATION STATEMENT" means a registration statement filed by
Aspen with the Commission for a public offering and sale of
securities of Aspen (other than a registration statement on Form
S-8 or Form S-4, or their successors, or any other form for a
similar limited purpose, or any registration statement covering
only securities proposed to be issued in exchange for securities
or assets of another corporation).

\*    \*    \*

2.  REGISTRATION RIGHTS

2.1.  INITIAL REGISTRATION

(a) TIMING OF INITIAL REGISTRATION. Subject to Section
2.1(b), Aspen shall file, by June 15, 2001, a shelf Registration
Statement on Form S-3 (the "Initial Registration") to register
368,461 of the shares of Aspen Common issued to the Stockholders
pursuant to the Purchase Agreement, which shares shall be
registered for offering by the Stockholders in the respective
numbers set forth in Schedule I hereto. Thereupon, Aspen shall
comply with the registration procedures of Section 2.3 with
respect to the Initial Registration.

(b) DEFERRAL OF INITIAL REGISTRATION. If at the time of the
Initial Registration pursuant to Section 2.1(a),

(i)   Aspen is engaged (or Aspen's Board of Directors
      has determined in good faith to engage within 90
      days of the time of the Initial Registration) in
      a registered public offering of securities for
      its own account or any other activity that, in
      the good faith determination of Aspen's Board of
      Directors, would be adversely affected by the
      Initial Registration, and

(ii)  Aspen's Board of Directors determines in good
      faith, by appropriate resolutions, that, as a
      result of such offering or other activity, (A) it
      would be detrimental to Aspen (other than as
      relating solely to the price of the Aspen Common)
      to file the Initial Registration at such time and
      (B) it is in the best interests of Aspen to defer
      proceeding with the Initial Registration at such
      time,

then Aspen may direct that the filing of the Initial Registration
be delayed for a period not to exceed (x) 120 days from the date
on which Aspen provides such direction or (y) the period during
which (in the good faith determination of Aspen's Board of
Directors) filing the Initial Registration would be detrimental to
Aspen, whichever occurs first. This right to delay filing the
Initial Registration may not be exercised by Aspen more than once.
Aspen represents and warrants to the Stockholders that, as of the
date hereof, there are no facts that would form the basis of a

7

good faith determination by the Board of Directors pursuant to this Section 2.1(b) to delay filing the Initial Registration.

(c) SUSPENSION OF INITIAL REGISTRATION. Aspen shall maintain the effectiveness of the Initial Registration for a period of 90 days after it has been first declared effective by the Commission, PROVIDED that if, as of the final date of such 90-day period, any other secondary shelf Registration Statement on Form S-3 of Aspen is effective, Aspen shall continue to maintain the effectiveness of the Initial Registration until such date as of which no other such secondary shelf Registration Statement is in effect. Notwithstanding the foregoing, Aspen may, by written notice to the Stockholders, suspend or withdraw any such Registration Statement and require that the Stockholders immediately cease the sale of shares of Aspen pursuant thereto if:

> (i)     Aspen is engaged in any activity or transaction or preparations or negotiations for any activity or transaction that Aspen desires to keep confidential for business reasons, and Aspen's Board of Directors determines in good faith, by appropriate resolutions, that the public disclosure requirements imposed on Aspen pursuant to such Registration Statement would require disclosure of such activity or transaction;

> (ii)    Aspen files a Registration Statement with the Commission for the purpose of registering under the Securities Act, any securities to be publicly offered and sold by Aspen; or

> (iii)   Aspen fails to satisfy the requirements for use of Form S-3, as set forth in the general instructions to Form S-3.

Upon receipt of such notice, each Stockholder shall immediately discontinue any sales of Registrable Shares pursuant to the Initial Registration until such Stockholder has received copies of a supplemented or amended Prospectus or until such Stockholder is advised in writing by Aspen that the then-current Prospectus may be used and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such Prospectus.

                         *    *    *

2.3. REGISTRATION PROCEDURES

(a) GENERAL. If and whenever Aspen is required by the provisions of this Agreement to use its best efforts to effect the registration of any Registrable Shares under the Securities Act, Aspen shall:

> (i)     prepare and file with the Commission a Registration Statement (including the Initial Registration) on an appropriate form as expeditiously as possible, and cause such Registration Statement to be declared effective by the Commission at the earliest practicable date;

> (ii)    as expeditiously as possible prepare and file with the Commission any amendments and

8

supplements to the Registration Statement and the
Prospectus included in the Registration Statement
as may be necessary to comply with the provisions
of the Securities Act (including the anti-fraud
provisions thereof) and to keep the Registration
Statement effective for at least 90 days from the
effective date (or, in the case of the Initial
Registration, for the period specified in Section
2.1(c)) or such lesser period until all such
Registrable Shares are sold; [and]

*    *    *

(vii)  promptly make available for inspection by the
       Selling Stockholders, any managing underwriter
       participating in any disposition pursuant to such
       Registration Statement, and any attorney or
       accountant or other agent retained by any such
       underwriter or selected by the Selling
       Stockholders, all financial and other records,
       pertinent corporate documents and properties of
       Aspen and cause Aspen's officers, directors,
       employees and independent accountants to supply
       all information reasonably requested by any such
       seller, underwriter, attorney, accountant or
       agent in connection with such Registration
       Statement.

33.    The RRA contained no promise or guarantee about when the

registration would become effective.

34.    The RRA contained no promise or guarantee that Aspen was

necessarily eligible to use the Form S-3 registration process (which usually takes less

time than the other methods of registration). In fact, the RRA specifically contemplated

that Aspen may not be eligible to use Form S-3. See, e.g., RRA § 2.1(c)(iii).

35.    The RRA contained no promise or guarantee that the shares in

Aspen were worth a particular price, or that they could be sold for a particular price or at

a particular time.

### June 15 - August 14, 2001: Aspen's Efforts To Effect The Registration

36.    On June 15, 2001, as per the RRA, Aspen filed a Form S-3

Registration with the SEC and began the process of trying to effect the registration of the

unregistered Aspen shares sold to CPU, including the shares distributed to Defendant by

9

CPU, pursuant to the terms of the RRA.

37.    From June 20, 2001 through July 6, 2001, Aspen's corporate counsel, Hale and Dorr LLP (now known as "Wilmer Cutler Pickering Hale and Dorr LLP) ("Hale and Dorr"), repeatedly contacted the SEC to obtain the name of the SEC staff examiner assigned to the Form S-3.

38.    On July 6, 2001, the SEC advised Hale and Dorr of the names of the reviewing accounting and corporation finance staff members. Immediately thereafter, Hale and Dorr left messages for both staff members, requesting information as to the SEC's plans with respect to its review of the Form S-3.

39.    On July 9, 2001, a SEC accounting staff member advised Hale and Dorr that in connection with the Form S-3 review, the accounting staff would be reviewing a March 9, 2001 letter that Aspen had submitted to the SEC in connection with the SEC's review of Aspen's Form 10-K and 10-Qs. Also, the SEC informed Hale and Dorr that its only comments to the Form S-3 would be those relating to the March 9, 2001 letter, and that these comments would be provided within approximately ten (10) business days.

40.    Ten business days later, on July 23, 2001, Hale and Dorr contacted the SEC to inquire as to status of its review.

41.    On July 24, 2001, the SEC faxed to Hale and Dorr a comment letter advising that Aspen should (1) disclose in a "recent developments" section the estimated amount of the restructuring charge to be taken by Aspen for the fiscal quarter ended June 30, 2001 (this information was incorporated by reference from the Form 10-Q for the fiscal quarter ended March 31, 2001, but apparently the staff thought it necessary

10

for Aspen to repeat the information in the body of the Form S-3 itself) and (2) confirm, among other things, that Aspen's audited financial statements for the fiscal year ended June 30, 2001 were not yet available.

  42.  The next day, July 25, 2001, Aspen responded in full to the SEC's comments.

  43.  From July 31, 2001 through August 8, 2001, Hale and Dorr repeatedly contacted the SEC to inquire as to status of the SEC's review of Aspen's July 25, 2001 response.

  44.  On August 9, 2001, the SEC faxed to Hale and Dorr a comment letter requesting additional detail regarding the restructuring charge (apparently missing the fact that a Current Report on Form 8-K filed on August 8, 2001 provided this information and was incorporated by reference into the Form S-3).

  45.  On August 10, 2001, Hale and Dorr left a message for the SEC corporation finance staff member assigned to the Form S-3 as to any need to file a second Amendment No. 2, given the earlier filing of the Form 8-K.

  46.  Neither Hale and Dorr nor Aspen heard from the SEC between August 10 and August 15, 2001.

  47.  At that time, Aspen common stock was trading between a high of $17.14 per share and a low of $16.32 per share.

### *August 15, 2001 - October 15, 2001: The Suspension Of The Registration*

  48.  On August 15, 2001, as permitted by the RRA, Aspen's Board of Directors adopted a vote as to the need to temporarily suspend the registration process in light of a business activity (Aspen's negotiation to purchase the company, HyproTech,

11

which Aspen has since acquired) that the Board determined had to be kept confidential. See RRA § 2.1(c)(i).

49.     Aspen provided written notice of the suspension to Defendant shortly after August 15, 2001.

50.     Between August 15, 2001 and October 15, 2001, Aspen common stock was trading between a high of $17.33 per share and a low of $7.79 per share.

### *October 15, 2001 - December 14, 2001: The Registration Is Completed*

51.     On or about October 31, 2001, Hale and Dorr discovered that beneficial stock ownership information for one of its directors was inadvertently omitted from the preliminary and definitive proxy materials and that definitive proxy materials may have been filed one, or possibly two, days after the 120-day period following end of fiscal year.

52.     On November 2, 2001, Hale and Dorr submitted to SEC examiner Loryn Zerner a waiver request to retain Form S-3 eligibility despite these issues. Also, on November 8, 2001, Hale and Dorr submitted a waiver request to Patricia Miller of the SEC's Office of Chief Counsel.

53.     In response to Hale and Dorr's communications, Ms. Zerner requested that Aspen withdraw the Form S-3 filed on June 15, 2001 (which Aspen did on November 16, 2001), and then re-submit a new Form S-3 for SEC review.

54.     On November 21, 2001, although the Form S-3 had already been withdrawn, Patricia Miller of the SEC informed Hale and Dorr that its waiver request had been granted and instructed Hale and Dorr to inform the SEC examiner of the same.

12

55.     On November 26, 2001, Aspen filed a new Form S-3, and responded to the SEC's remaining comments three days later.

56.     Even though Aspen re-filed the Form S-3 as per the SEC's staff member's request, the SEC did not treat it as such, and instead continued the review process it had initiated in June 2001.

57.     Shortly thereafter, Hale and Dorr was informed by the SEC that it had concluded its review and was prepared to effectuate the Form S-3 registration.

58.     On December 12, 2001, Aspen requested that the SEC accelerate the effective date of the registration.

59.     On December 14, 2001, the SEC declared the Form S-3 registration effective.

60.     Pursuant to the RRA, starting on December 14, 2001, Defendant had a 90-day window within which the sell its shares of Aspen stock. See RRA § 2.3(ii). During this time, Aspen common stock was trading between a high of $22.45 per share and a low of $14.16 per share.

## The Present Dispute

61.     Upon information and belief, Defendant sold its shares of Aspen stock at a price lower than what it had hoped, and now expects Aspen to make up the difference, under the pretense that Aspen breached the RRA.

62.     It is Aspen's position that it fully performed its obligations under the RRA, did not cause any of Defendant's so-called "damages" and has no obligation, under the RRA or otherwise, to insure against Defendant's apparent belief that it lost money.

13

## COUNT ONE
### (Declaratory Relief: Aspen Did Not Breach The RRA)

63.    Aspen repeats and realleges the averments set forth in paragraphs 1 through 62 above.

64.    An actual controversy has arisen and now exists between Aspen and Defendant.

65.    To resolve this controversy, Aspen requires a judicial determination of Aspen's performance of all material obligations under the RRA and a declaration that Aspen has fully performed all such obligations.

66.    Such a declaration is necessary and appropriate at this time in order that Aspen may ascertain the respective rights and obligations of the parties.

67.    Aspen therefore requests that the Court determine Aspen's actions with respect to performing the material obligations in the RRA fully satisfied and establish, inter alia, that:

(i)    Aspen did not breach the RRA;

(ii)    alternatively, that any failure by Aspen to satisfy all of its material obligations under the RRA has been excused;

(iii)    alternatively, that any failure by Aspen to satisfy all of its material obligations under the RRA has been waived; or

(iv)    alternatively, to the extent Aspen has failed to satisfy any of its material obligations under the RRA, that the performance of such obligations was rendered impossible and/or impracticable.

68.    A declaration that Defendant is not entitled to damages in connection with their acquisition of shares of Aspen's stock will permanently resolve the controversy.

## COUNT TWO
### (Declaratory Relief: Aspen Did Not Cause Defendant's Alleged Injury)

69.     Aspen repeats and realleges the averments set forth in paragraphs 1 through 68 above.

70.     An actual controversy has arisen and now exists between Aspen and Defendant.

71.     To resolve this controversy, Aspen requires a judicial determination of the causal relation, if any, between Aspen's actions or inactions with respect to the RRA and Defendant's alleged "damages."

72.     Such a declaration is necessary and appropriate at this time in order that Aspen may ascertain the respective rights and obligations of the parties.

73.     Aspen therefore requests that the Court determine that, to the extent it finds that Aspen failed to satisfy any of its material obligations under the RRA, the performance or non-performance of any such obligations was not the cause of Defendant's alleged "damages."

74.     A declaration that Defendant is not entitled to damages in connection with their acquisition of shares of Aspen's stock will permanently resolve the controversy.

WHEREFORE, Aspen prays for judgment as follows:

A.    For the declarations set forth above with respect to Counts One and

Two;

B.    For an Order awarding Aspen its attorneys' fees and costs incurred

herein; and

C.    For such other and further relief as the Court deems just and proper.

Dated: August 23, 2004
       Boston, Massachusetts

Respectfully submitted,


Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO #656118)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Telephone: (617) 573-4800

Counsel for Plaintiff
Aspen Technology, Inc.

# CIVIL COVER SHEET

JS 44 (Rev. 3/99)

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ASPEN TECHNOLGY, INC.

**DEFENDANTS**

TV SOFTWARE L.L.C.

04 - 11830 PBS

**(b)** County of Residence of First Listed Plaintiff  Suffolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address and Telephone Number)

Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO #656118)
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

Attorneys (If Known)

Eugene G. Taggart
Taggart, Morton, Ogden, Staub, Rougelot & O'Brien, L.L.C.
2100 Energy Centre, 1100 Poydras Street
New Orleans, Louisiana 70163
(504) 599-8500

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government
  Plaintiff
- ☐ 2 U.S. Government
  Defendant
- ☐ 3 Federal Question
  (U.S. Government Not a Party)
- ☒ 4 Diversity
  (Indicate Citizenship of Parties
  in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC<br>☐ 630 Liquor Laws<br>☐ 640 R. R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS -Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. §§ 1332 and 2201.  Declaratory judgment action to resolve controversy over plaintiff's performance of registration rights agreement.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Declaratory Relief

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY (see instructions):

JUDGE  N/A          DOCKET NUMBER  N/A

DATE

August 23, 2004

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

American LegalNet, Inc.   www.USCourtForms.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)  Aspen Technology, Inc. v. F/V Software, L.L.C.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

- [ ] I.  160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [ ] II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.  *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

- [x] III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

- [ ] IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

- [ ] V.  150, 152, 153.

04 - 11830 PBS

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
YES [ ]  NO [x]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)
YES [ ]  NO [x]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
YES [ ]  NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
YES [ ]  NO [x]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
YES [x]  NO [ ]

A. If yes, in which division do all of the non-governmental parties reside?
Eastern Division [x]  Central Division [ ]  Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
Eastern Division [ ]  Central Division [ ]  Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
YES [ ]  NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  Thomas J. Dougherty; Justin J. Daniels
ADDRESS  Skadden, Arps, Slate, Meagher & Flom LLP, One Beacon Street, Boston, Massachusetts  02108
TELEPHONE NO.  (617) 573-4800

(Coversheetlocal.wpd - 10/17/02)