UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - x

ASPEN TECHNOLOGY, INC.,                    :

               Plaintiff,              :          Civil Action
                                    No. 04-11830-PBS

           v.                           :

F/V SOFTWARE, L.L.C.,                      :          ORAL ARGUMENT
                                    REQUESTED

              Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - x


## ASPEN TECHNOLOGY, INC.'S MEMORANDUM IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS


Dated: November 4, 2004

                              Thomas J. Dougherty
                              Justin J. Daniels
                              SKADDEN, ARPS, SLATE,
                                  MEAGHER & FLOM LLP
                              One Beacon Street
                              Boston, Massachusetts 02108
                              (617) 573-4800

## TABLE OF CONTENTS

PAGE

Table of Authorities ........................................................................................................ ii

Preliminary Statement ..................................................................................................... 1

Background ...................................................................................................................... 2

Argument ....................................................................................................................... 11

I.    ALL JURISDICTIONAL PREREQUISITES ARE SATISFIED ........................................ 11

    A.    The Court Has Jurisdiction Over The Subject Matter ................................ 11

    B.    The Court Has Jurisdiction Over The Parties ............................................. 13

        1.    Aspen's Claim Directly Relates To And Arises From
            F/V's Contacts With Massachusetts ................................................. 13

        2.    F/V Purposely Availed Itself Of The Benefits And
            Protections Of Massachusetts Law ................................................. 14

        3.    The "Gestalt" Factors Also Point To Jurisdiction............................ 15

II.   ALL DISCRETIONARY CONSIDERATIONS ARE SATISFIED .................................... 16

    A.    This Is The First-Filed Action..................................................................... 17

    B.    This Is A Textbook Case For A Declaratory Judgment Action.................... 17

    C.    F/V's Two Arguments Misstate The Governing Law
       And Ignore The Factual History Between The Parties ................................ 18

        1.    The Promotion Of ADR.................................................................... 18

        2.    Forum Shopping............................................................................. 19

Conclusion ..................................................................................................................... 20

TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

Aetna Life Ins. Co. v. Haworth,
    300 U.S. 227 (1937)......................................................................................11, 12

Aspen Tech., Inc. v. F/V Software, L.L.C.,
    No. 04-11830 (D. Mass., filed and served Aug. 23, 2004)............................... passim

Benbow, et al. v. Aspen Tech., Inc.,
    No. 02-2881 (E.D. La., Amended Complaint filed Nov. 27, 2002) ................................. passim

Benbow, et al. v. Aspen Tech., Inc.,
    No. 582-137 (La. Dist. Ct., Jefferson Parish) ............................................................7

Biogen, Inc. v. Schering AG,
    954 F. Supp. 391 (D. Mass. 1996) ........................................................................16, 18

Bond Leather Co. v. Q.T. Shoe Mfg. Co.,
    764 F.2d 928, 932 (1st Cir. 1985)............................................................................14

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985)............................................................................................14

Coady v. Ashcraft & Gerel,
    223 F.3d 1 (1st Cir. 2000)....................................................................................17

Davox Corp. v. Digital Sys. Int'l, Inc.,
    846 F. Supp. 144 (D. Mass 1993) ........................................................................18

Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,
    290 F.3d 42 (1st Cir. 2002) ................................................................................15

Ealing Corp. v. Harrods Ltd.,
    790 F.2d at 983 ............................................................................................13, 14

EMC Corp. v. Norand Corp.,
    89 F.3d 807 (Fed. Cir. 1996)............................................................................17, 18, 19

Fairview Mach. & Tool Co., Inc. v. Oakbrook Int'l, Inc.,
    56 F. Supp. 2d 134 (D. Mass 1999) ....................................................................15, 16

F/V Software, L.L.C. v. Aspen Tech., Inc.,
    No. 04-2485 (E.D. La., filed Aug. 31, 2004 and served Sept. 27, 2004)........................ passim

Ganis Corp. of Cal. v. Jackson,
    822 F.2d 194 (1st Cir. 1987)................................................................................15

CASES                                                                      PAGE(S)

GSI Lumonics, Inc. v. Biodiscovery, Inc.,
   112 F. Supp. 2d 99 (D. Mass. 2000) ...............................................................2, 17, 19

Hudson County News Co. v. Metro. Assoc., Inc.,
   141 F.R.D. 386 (D. Mass. 1992)......................................................................................20

JMTR Enterprises, L.L.C. v. Duchin,
   42 F. Supp. 2d 87 (D. Mass. 1999) .........................................................................13, 14

Levin v. Harned,
   304 F. Supp. 2d 136 (D. Mass. 2003) ............................................................................13

Lexington Ins. Co. v. City of Phoenix,
   No. 96-10319, 1996 WL 463672 (D. Mass. 1996) ..................................................19, 20

Metro. Transp. Co. v. Underwriters At Lloyd's Of London,
   No. 88-3325, 1989 WL 79778 (E.D. Pa. July 7, 1989). ................................................18

Neely v. Benefits Review Board,
   139 F.3d 276 (1st Cir. 1998).........................................................................................12

Nova Biomedical Corp. v. Moller,
   629 F.2d 190 (1st Cir. 1980).........................................................................................14

Schnabel v. Ramsey Quantitative Sys., Inc.,
   322 F. Supp. 2d 505 (S.D.N.Y. 2004)...........................................................................19

State of R.I. v. Narragansett Indian Tribe,
   19 F.3d 685 (1st Cir. 1994)...........................................................................................11

United Capitol Ins. Co. v. Kapiloff,
   155 F.3d 488 (4th Cir.1998) .........................................................................................19

U.S. v. Swiss America Bank, Ltd.,
   274 F.3d 610 (1st Cir. 2001).....................................................................................13, 14

Wilton v. Seven Falls Co.,
   515 U.S. 277 (1995).......................................................................................................16

Workgroup Tech., Corp. v. MGM Grand Hotel, L.L.C.
   246 F. Supp. 2d 102 (D. Mass. 2002) ...........................................................................14

STATUTES AND RULES                                                         PAGE(S)

28 U.S.C. § 1404(a) ..............................................................................................................2

Mass. Gen. Laws Ch. 223A .................................................................................................13

Plaintiff Aspen Technology, Inc. ("Aspen") respectfully submits this memorandum and supporting papers[1] in opposition to defendant F/V Software, L.L.C. ("F/V")'s motion to dismiss Aspen's Complaint For Declaratory Judgment ("Aspen Complaint").

## **Preliminary Statement**

This action is the first-filed of two identical actions pending in two different federal district courts between the same parties: Aspen Technology, Inc. v. F/V Software, L.L.C., No. 04-11830 (D. Mass., filed and served Aug. 23, 2004), and F/V Software, L.L.C. v. Aspen Technology, Inc., No. 04-2485 (E.D. La., filed Aug. 31, 2004 and served Sept. 27, 2004) ("F/V Complaint").[2] By its own admission, F/V filed the Louisiana suit simply as a response to Aspen's suit in Massachusetts. See F/V's Sept. 30, 2004 Memorandum Of Reasons In Support Of Motion To Dismiss Complaint For Declaratory Judgment ("F/V Mem.") at 11.

F/V moves to dismiss the action on the basis of subject matter and personal jurisdiction. It claims that there is no "actual controversy" between the parties and that F/V does not have sufficient contacts with Massachusetts. It also accuses Aspen of bringing this action for "improper tactical purposes" rather than to secure legitimate relief from F/V's allegations of contract breach and damages. F/V Mem. at 1.

---

[1] In addition to this memorandum, Aspen submits the Nov. 4, 2004 Affidavit of Stephen J. Doyle ("Doyle Aff."); Nov. 4, 2004 Affidavit of Mark. L. Johnson ("Johnson Aff."); and Nov. 4, 2004 Affidavit of Justin J. Daniels ("Daniels Aff."). All citations in the form "Tab __" are references to the transmitted documents in the Doyle Aff.

[2] There was also an earlier, related litigation involving the same disputed Registration Rights Agreement and same counsel for the parties, that has since been resolved. Benbow, et al. v. Aspen Technology, Inc., No. 02-2881 (E.D. La., Amended Complaint filed Nov. 27, 2002). All references to "F/V's counsel" or the "Taggart firm" are to Taggart, Morton, Ogden, Staub, Rougelot & O'Brien, L.L.C., counsel to the plaintiffs in the Benbow action as well as F/V in the action now before this Court.

1

As will be demonstrated more fully below, F/V's motion is meritless and should be denied. <u>First</u>, F/V misstates the relevant law. <u>Second</u>, it glosses over or simply ignores the material facts. <u>Third</u>, it makes baseless accusations about Aspen's motives without any evidentiary support. In fact, the only party trying to be aggressive with the rules is F/V; by suing Aspen in Louisiana and simultaneously asking the Court to dismiss the action here, F/V is doing nothing more than asking this Court to transfer venue without a proper showing.[3] In sum, F/V's conclusory arguments without proper authority or supported facts do nothing to overcome the "strong presumption" in favor of the first-filed federal action.

### Background

F/V would like this Court to believe that its counsel's letter of August 11, 2004 to Aspen was the first time the parties communicated about the issues now in dispute. <u>See</u> F/V Mem. at 3 ("Other than its Complaint for Declaratory Judgment filed in this court, Aspen has made absolutely no communication to F/V concerning its position on the performance or non-performance of the RRA or the proper measure of damages."). It would also like the Court to assume, without proof, that because Aspen filed suit rather than respond directly to the August 11 letter's request for "a telephone call from Aspen counsel 'in the hope that this matter can be resolved without litigation,'" <u>id.</u>, that this lawsuit was brought in bad faith.

F/V's assertions are demonstrably false. Provided below is a detailed chronology of the relevant facts. The chronology relies exclusively on documentary and testimonial evidence and the uncontested allegations from Aspen's Complaint. What becomes perfectly

---

[3]     As Chief Judge Young observed in one of the decisions F/V cites as authority: "[Defendant's] motion to dismiss, now stripped of his assertion that his own claim was first filed, could be interpreted as a request to transfer venue pursuant to 28 U.S.C. § 1404(a) . . . [Defendant] has not brought such a motion, but it is implied from the portions of the motion that do not rely on his now-rejected 'first-filed' argument." GSI Lumonics, Inc. v. Biodiscovery, Inc., 112 F. Supp. 2d 99, 104 (D. Mass. 2000) (<u>cited at</u> F/V Mem. at 12).

clear from these facts is that Aspen had more than sufficient grounds for bringing this action; was perfectly within its rights in selecting Massachusetts as the forum; and that it is F/V's Louisiana counsel, not Aspen, who has played improper tactical games with the courts. The chronology follows (with paragraph identifiers for ease of reference):

      A.    Between March and June 2001, Aspen negotiated the acquisition of a Louisiana company, Coppermine LLC, from Computerized Processes Unlimited, L.L.C. ("CPU"), in which F/V and other venture capitalists were majority owners.[4]

      B.    The purchase itself was embodied in a "Membership Interest Purchase Agreement" ("Purchase Agreement"). Under the terms of the Purchase Agreement, CPU conveyed all of its interest in Coppermine to Aspen in exchange for approximately 400,000 unregistered shares of Aspen common stock. F/V received Aspen unregistered stock as "designees for CPU" as a "distribution, without consideration."[5]

      C.    F/V was not a party to the Purchase Agreement. The only contract to which Aspen and F/V were counterparties, and thus the only contract at issue in the current dispute, was a Registration Rights Agreement ("RRA"), under which Aspen agreed to "provide for certain arrangements with respect to the registration of [the shares] under the Securities Act of 1933."[6] By its terms, the RRA is governed by and construed in accordance with Massachusetts law. RRA § 4.4. In addition, the RRA is a fully-integrated contract, and "constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof." Id. § 4.3.

---

[4]     Aspen Complaint ¶¶ 15-22, 24.

[5]     Id. ¶¶ 25-26.

[6]     Id. ¶¶ 27-30 & Ex. A (RRA).

D.    The negotiation of the RRA took place between Hale and Dorr LLP of Boston, Massachusetts on behalf of Aspen, and Sher Garner Cahill Richter Klein McAlister & Hilbert, LLC. of New Orleans, Louisiana ("Sher Garner") on behalf of F/V and the other counterparties.[7]

E.    The negotiations themselves were contested and compromises were made on both sides. Numerous documents relating to the RRA were faxed and sent by electronic mail between the parties to and from Massachusetts. No less than nine (9) drafts of the RRA were drawn up and sent back and forth from Massachusetts,[8] and more than thirty (30) e-mails were sent from Sher Garner to Hale and Dorr in Massachusetts.[9]

F.    In addition to the documents, numerous phone calls took place between the attorneys for Aspen and F/V regarding the RRA. There were at least ten (10) such phone calls over the course of the negotiation, all of which involved agents for F/V (and the other investors) contacting agents for Aspen in Massachusetts.[10]

G.    David Erath, an owner of F/V, was the principal negotiator of the Coppermine transaction on behalf of F/V and certain other interests. Among other things, Mr. Erath participated in a lengthy pre-closing negotiation concerning the Coppermine transaction -- including the terms of the RRA -- while the principals, on behalf of Aspen, and located in Massachusetts, were conferenced in by phone.[11]

---

[7]    Johnson Aff. ¶ 6. Sher Garner is F/V's general corporate counsel and was retained for purposes of the Coppermine transaction. See Jan 13, 2004 Dep. of D. Erath in Benbow, et al. v. Aspen Technology, Inc., No. 02-2881 (E.D. La.), Tab 27 at 29.

[8]    See Tabs 1-5, 7, 10, 11, 13-14.

[9]    Johnson Aff. ¶ 7; see Tabs 2-3, 5, 8, 9, 12-13, 18, 20.

[10]    Johnson Aff. ¶ 8.

[11]    Jan. 13, 2004 Dep. of D. Erath, Tab 27 at 118.

H.     Multiple additional documents were exchanged between the parties the day before the closing.[12]  Among them was a letter addressed directly to Aspen in Massachusetts, in which F/V represented that it had "adequate opportunity to obtain from representatives of Aspen such information about Aspen as is necessary for [F/V] to evaluate the merits and risks of [F/V's] acquisition of the Shares"; that it was an "'accredited investor'" as defined by Rule 501(a) under the Securities Act; and that it had "sufficient expertise in business and financial matters be able to evaluate the risks involved . . . and to make an informed investment decision with respect to [the] acquisition."[13]

I.     In the weeks after the closing, David Erath of F/V made numerous calls to Aspen, in Massachusetts, inquiring about the status of the registration.[14]

J.     In August of 2001, unbeknownst to Aspen, representatives of the Louisiana interests (including F/V) met with the Taggart firm, the same lawyers now representing F/V in this action, to discuss whether to sue Aspen.  As David Erath testified at deposition on January 13, 2004: "[I]t was suggested by somebody that there may be a reason to take action against Aspen, and that they wanted -- they were trying to determine how do we go about doing that."[15]  F/V decided at the time not to sue Aspen because "at that point, we were not interested in paying for it ourselves."[16]

K.     On October 30, 2001, the Taggart firm wrote a letter to Aspen similar to the one it wrote to Aspen on August 11, 2004 on behalf of F/V, purporting to represent Michael

---

12     See Tabs 15-16.

13     See June 14, 2001 Investment Rep. Letter from D. Erath of F/V to Aspen, Tab 15.

14     Jan. 13, 2004 Dep. of D. Erath, Tab 27 at 162.

15     Id. at 202.

16     Id. at 203.

S. Benbow "and other claimants."[17]  Aspen was not informed who the "other claimants" were. In the letter, Mr. Taggart stated that his clients were "interested in discussing this matter with you to negotiate an amicable resolution of their claims and to avoid the time and expense that is inherent in litigation."[18]

      L.     Aspen did not sue.  Rather, over the course of the next several months, Aspen's then-General Counsel Michael Muscatello tried to engage Mr. Taggart in a good faith dialogue in the hopes of settling the dispute without litigation.  Among other things, he sent to Mr. Taggart a chronology prepared by counsel of the events surrounding the dispute.[19]  Mr. Taggart responded to the e-mail by asking for a series of documents, which Mr. Muscatello sent to him shortly thereafter.[20]

      M.     In January of 2002, Aspen also requested a meeting with Mr. Taggart to discuss the dispute.  However, as Mr. Muscatello reported, "they have indicated that they are unwilling to meet until we have made a counter-offer."[21]

      N.     In May of 2002, Aspen received a letter from Mr. Taggart, indicating the he had been "attempting to negotiate a settlement" with Mr. Muscatello and that he had been waiting for a response.  Mr. Taggart also attached a courtesy copy of a state court complaint that he had "prepared for filing at court on behalf of the claimants."  He then asked Aspen to "let [him] know in the next 10 days if Aspen is still willing to reach an out-of-court settlement and

---

[17]    See Letter from E. Taggart to L. Evans of Aspen, Tab 17.

[18]    Id.

[19]    See Nov. 13, 2001 E-mail from E. Taggart to M. Muscatello of Aspen, Tab 18.

[20]    See Nov. 13, 2001 E-mail from E. Taggart to M. Muscatello of Aspen, Tab 18; Nov. 19, 2001 Fax from M. Muscatello of Aspen to E. Taggart, Tab 19.

[21]    Jan. 14, 2002 Memo from M. Muscatello of Aspen to T. Dougherty of Skadden, Tab. 21 (redacted on the grounds of attorney-client privilege) (emphasis added).

avoid the time and expense of litigation."[22]  The draft petition attached to Mr. Taggart's letter stated claims involving the same transaction that is the subject of this action[23]

      O.      In early June 2002, Stephen Doyle, who had only recently transitioned into the position of Acting General Counsel, became aware of Mr. Taggart's May 8 letter.  He had not seen the letter earlier because of logistical issues relating to the transition.[24]

      P.      Mr. Doyle immediately undertook a review of the matter in the hopes of resolving the dispute without litigation.  On June 5, 2002, he responded to Mr. Taggart's letter and stated that he "just received a copy of your letter to Mr. Evans" and was presently "reviewing the file in order to respond."  Mr. Doyle then thanked Mr. Taggart for his understanding.[25]

      Q.      Instead of waiting for Mr. Doyle's response, F/V's counsel, on June 17, 2002, unbeknownst to Aspen, and with Aspen still working toward a settlement, filed suit against Aspen in Louisiana State Court.[26]  It kept this hidden until August 19, 2002, when it finally served the complaint.[27]

      R.      On July 23, 2002, with a lawsuit already pending in Louisiana state court without Aspen's knowledge, Mr. Taggart wrote to Mr. Doyle and stated that "[a]lthough we are interested in reaching an amicable settlement, I now advise you that my clients have instructed

---

[22]     May 8, 2002 Letter from E. Taggart to L. Evans of Aspen, Tab 22.

[23]     Id.

[24]     Doyle Aff. ¶ 2.

[25]     June 5, 2002 Letter from S. Doyle of Aspen to E. Taggart, Tab 23.

[26]     See June 17, 2002, Petition for Damages, Benbow, et al. v. Aspen Technology, Inc., No. 582-137 (La. Dist. Ct., Jefferson Parish), Tab 24.

[27]     See Service of Process Transmittal Form, Tab 26.

me to proceed to court. We are willing, however, to continue settlement discussions."[28] Mr. Taggart did not tell Mr. Doyle was he had already sued Aspen in Louisiana State Court nearly a month before.

      S.    Ultimately the state court litigation was removed to federal court and became the Benbow v. Aspen litigation. During the course of the Benbow litigation, contrary to Taggart's assertion now, Aspen's counsel reached out to F/V's counsel to discuss the parties' respective positions on the dispute. In a conversation with F/V's corporate counsel in the summer of 2003, Aspen's counsel explained the company's position and why it believed that any claims against it did not have merit. F/V's counsel stated that as far as he was concerned F/V was in the "same position" as the plaintiffs in Benbow vis-à-vis claims against Aspen.[29]

      T.    In addition, during the course of the Benbow litigation Aspen attempted reached out to David Erath of F/V to discuss the dispute, but F/V refused. According to Mr. Erath, his lawyer "came back to me and said that he didn't advise me to speak to Aspen."[30]

      U.    Later in 2003, in the context of settlement discussions, the Taggart firm communicated to Aspen's counsel a proposed "global" settlement of the dispute between Aspen and all potential plaintiffs, including F/V.[31] Mr. Erath confirmed this at his deposition:

> Q.    Okay. What was the next time you met with plaintiffs' lawyers?
>
> A.    There was a meeting, again, somewhere in the intervening period at their office; again, a short meeting.
>
> Q.    And what was the nature of that meeting?

---

[28]    July 23, 2002 Letter from E. Taggart to S. Doyle of Aspen, Tab 25.

[29]    Daniels Aff. ¶ 3.

[30]    Jan. 13, 2004 Dep. of D. Erath, Tab 27 at 45.

[31]    Daniels Aff. ¶ 4.

A.  That was to discuss what our -- whether we would be interested in joining the suit or entering into settlement discussions if they occurred, what our position was going to be as additional owners of the company that may have a similar position to the plaintiffs.

Q.  Was it your opinion that you had a similar position to the plaintiffs, with respect to this lawsuit?

A.  Well, again, I'm not as aware of all of the facts. I haven't perused all of these documents, but I think we're in a similar position, yes.[32]

Aspen rejected F/V's counsel's offer.[33]  Further, during the court-ordered settlement negotiations in the <u>Benbow</u> matter, Aspen made clear to the Taggart firm that it believed the claims to be without merit.[34]

V.  On January 13, 2004, during the course of David Erath's deposition in the <u>Benbow</u> matter, Aspen was informed that F/V had been secretly meeting with the Taggart firm over the previous weeks to discuss the merits of the lawsuit and whether F/V should sue Aspen.[35] During at least one of these meetings, the Taggart firm even tried to <u>recruit F/V</u> to join the <u>Benbow</u> litigation against Aspen.[36]  Significantly, Mr. Erath testified that F/V had not yet determined if it would sue, but that "there is a possibility that we will take action." Mr. Erath said he had "no specific timetable" for making a decision.[37]

W.  The next time Aspen heard from F/V was in the August 11, 2004 letter.[38]

---

[32]    Jan. 13, 2004 Dep. of D. Erath, Tab 27 at 45-46.

[33]    Daniels Aff. ¶ 4.

[34]    Doyle Aff. ¶ 4; Daniels Aff. ¶ 3.

[35]    Jan. 13, 2004 Dep. of D. Erath, Tab 27 at 46.

[36]    <u>Id.</u> at 46.

[37]    <u>Id.</u> at 49.

[38]    Aug. 11, 2004 Letter From E. Taggart to Stephen Doyle of Aspen, Tab 28.

X.       After deliberation with counsel, Aspen determined to bring a declaratory action on August 23, 2004. This was based on a good faith business decision that a lawsuit was necessary and inevitable:[39]

<u>First</u>, Aspen faced significant uncertainty as to when, if ever, F/V would ultimately decide to bring its claims. F/V had apparently been thinking about suing Aspen for over 3 years, and had openly threatened a possible lawsuit against Aspen on the same facts in early 2004, yet never sued. In addition, F/V's counsel has already demonstrated a willingness to mislead Aspen about settlement and then file suit: a virtually identical letter was sent to Aspen three years ago on the same facts, and while Aspen thought it was attempting to negotiate a settlement, F/V's counsel secretly sued it in Louisiana State Court. Even here, F/V's counsel has proven the uncertainty that Aspen would have faced in the absence of a declaratory judgment action: although F/V filed its Louisiana lawsuit on August 31, 2004, it waited <u>nearly a month</u> before actually serving it on Aspen.

<u>Second</u>, this is not an academic exercise. F/V has accused Aspen of contract breach in connection with federal securities registration and has claimed damages. Further, the uncertainty is acute in this case because the contract at issue is one of ongoing importance to Aspen's business. As a public company, Aspen relies on registration statements in connection with potential acquisitions or related transactions, and the "registration rights agreement" forms a key component of these transactions. The form of registration statement used by Aspen is the transaction at issue here is one that Aspen has used in varying forms in numerous other transactions; and may continue to use in the future. Although it believes its interpretation of the RRA to be correct, F/V's counsel has now challenged its meaning for the second time, and

---

[39]      See <u>generally</u> Doyle Aff. ¶¶ 5-6; Johnson Aff. ¶ 5.

Aspen should be permitted to resolve those issues now rather than wait for a possible lawsuit and enter into additional transactions with the same contract.

Third, Aspen did not, and does not, believe settlement discussions would be fruitful at this stage -- and it never led F/V to think otherwise. It has always been Aspen's position that these claims are frivolous and contradicted by the plain terms of the RRA.[40] This position has been communicated to F/V's counsel on numerous occasions. Further, when Aspen did try to discuss the issue with F/V, it refused to meet; and when Aspen tried to have a meeting with F/V's counsel, it was told that they could not meet with Aspen until Aspen made a counteroffer.

**Argument**

## I.    ALL JURISDICTIONAL PREREQUISITES ARE SATISFIED

### A.    The Court Has Jurisdiction Over The Subject Matter

F/V challenges the subject matter jurisdiction of this Court on the grounds that there is no "actual controversy between the parties." See F/V Mem. At 10-11. This argument borders on the frivolous (and makes even less sense given that F/V elsewhere argues that Aspen's case is inappropriate "anticipatory litigation," see id. at 6-10).

"The linchpin of ripeness under the Declaratory Judgment Act, as in all Article III cases, is adverseness." State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685, 692 (1st Cir. 1994) (citing, inter alia, Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937)). If the controversy "admits a specific relief" and "would serve a useful purpose," the controversy is sufficiently ripe for purposes of a declaratory judgment action. Narragansett, 19 F.3d at 693 (citations and internal quotations omitted). As per the First Circuit: "[O]ur concern is whether

---

[40]    Indeed, Aspen went as far as trial before settling the Benbow litigation.

this is actually a 'live' controversy or whether the likelihood of any practical effect from a ruling is so slight as to raise nothing more than a hypothetical question." Neely v. Benefits Review Bd., 139 F.3d 276, 279 (1st Cir. 1998).

Here the controversy could not be more "live" nor the practical effect of a ruling more concrete. Aspen and F/V entered into a contract governing the registration of certain securities. F/V contends that it was damaged when Aspen breached the contract. Aspen maintains that it performed all of its obligations under the contract and has been damaged by F/V's ongoing threat to sue. Both sides were aware of the other's adverse positions and claimed injury. See supra p. 8, ¶¶ S-U. As in Aetna Life Ins. Co. v. Haworth, "prior to this suit, the parties had taken adverse position with respect to their existing obligations." Id. at 242. Thus, this dispute is "manifestly susceptible of judicial determination . . . it calls for . . . an adjudication of present right upon established facts." Id.

Despite the self-evident nature of the controversy, F/V maintains that "no actual controversy existed when Aspen filed its Complaint" because F/V's counsel offered to try to resolve the dispute absent litigation. See F/V Mem. at 11. In support of this claim, F/V cites a handful of inapposite patent cases for a different, "reasonable apprehension" standard. Id. at 10. In any event, Aspen did have a reasonable apprehension of facing a lawsuit. F/V's counsel's past practice of writing conciliatory letters while secretly bringing lawsuits (see supra pp. 7-8), the fact that Mr. Erath already indicated F/V's willingness to sue (p. 8), its claim that Aspen already caused it injury (p. 9), and Aspen's open position that it considered these claims frivolous (p. 11), all pointed toward a lawsuit.

12

B.    **The Court Has Jurisdiction Over The Parties**

This Court has personal jurisdiction over F/V under Section 3(a) of the

Massachusetts long-arm statute, Mass. Gen. Laws Ch. 223A ("transacting any business in this

commonwealth"). As this Court has recognized, Section 3(a) "has been construed broadly,"

permitting jurisdiction where there is "any purposeful act directed to the forum state." Levin v.

Harned, 304 F. Supp. 2d 136 (D. Mass. 2003) (Saris, J.) (citing Ealing Corp. v. Harrods Ltd., 790

F.2d 978, 982 (1st Cir. 1986)). Further, "the jurisdictional inquiry is largely a federal

constitutional one because the Massachusetts courts construe Section 3(a) transacting business

requisite as extending jurisdiction to the horizons of the Due Process Clause of the Fourteenth

Amendment." Levin, 304 F. Supp. 2d at 146. Thus, where personal jurisdiction is based on

specific rather than general jurisdiction, the Court makes a three-part inquiry:

> Specific personal jurisdiction can be asserted over a defendant only
> if: (1) the claim "directly relates to or arises from the defendant's
> contacts with the forum"; and (2) "the contacts constitute
> purposeful availment of the benefits and protections afforded by
> the forum's laws." If these two requirements are met, then (3) the
> court must look at the "overall reasonableness of the exercise of
> jurisdiction in light of a variety of pertinent factors that touch upon
> the fundamental fairness of an exercise of jurisdiction.

Id. at 146 (citing U.S. v. Swiss Am. Bank, Ltd., 274 F.3d 610, 620-21 (1st Cir. 2001)).

1.    **Aspen's Claim Directly Relates To And Arises From**
      **F/V's Contacts With Massachusetts**

The "relates to-arises from" requirement is a "flexible, relaxed standard, as

suggested by the disjunctive nature of the requirement," JMTR Enterprises, L.L.C. v. Duchin,

42 F. Supp. 2d 87, 98 (D. Mass. 1999); and involves an examination of the "nexus between

defendant's contacts and the plaintiff's cause of action," Swiss Am. Bank, 274 F.3d at 621

(citation and internal quotations omitted). While it is true that a contract, by itself, "cannot

13

automatically establish minimum contacts," the "prior negotiations and contemplated future consequences, along with … the parties' actual counsel dealing" in connection with the contract can be sufficient. See Swiss Am., 274 F.3d at 621 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479 (1985). For example, in Workgroup Technology Corp. v. MGM Grand Hotel, LLC, 246 F. Supp 2d. 102 (D. Mass. 2002), a Nevada hotel allegedly breached its contract with a Massachusetts corporation by failing to refund deposit monies. The Nevada hotel's lone contacts with Massachusetts were telephone calls, faxes, and e-mails exchanged between the parties while negotiating the disputed contract. Id. at 107-108. These contacts were "instrumental in the formation" of the disputed contract. Id. at 113. Thus, the Massachusetts corporation's claim "arose from" MGM's contacts within Massachusetts.

Similarly, in the instant case, F/V's chief contacts with Massachusetts were extensive communications (phone calls, e-mails, and faxes) transmitted back and forth while negotiating the RRA. See supra p. 4, ¶¶ E-F. There would be no contract and no dispute "but for" these contacts. As the contacts were clearly "instrumental" in the formation of the contract, the "relates to-arises from" requirement is met easily.

2. **F/V Purposely Availed Itself Of The Benefits And Protections Of Massachusetts Law**

Here, F/V engaged in a pattern of purposeful activity directed toward Aspen in Massachusetts. The First Circuit has held that a foreign defendant's sending of a single telex to a plaintiff in Massachusetts can fulfill this requirement. JMTR Enters., 42 F. Supp. 2d at 95-96 (citing Ealing Corp., 790 F.2d at 983); see also Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 932 (1st Cir. 1985) (four letters and one telephone call fulfilled §3(a)); Nova Biomedical Corp. v. Moller, 629 F.2d 190, 193-95 (1st Cir. 1980) (two letters charging infringement fulfilled §3(a)).

14

Among other things, F/V and/or its agents:[41]

(i)     Served as the "lead" in negotiating the RRA with Aspen and its agents in Massachusetts (see supra p. 4, ¶ F);

(ii)    Placed at least 10 phone calls to Aspen and its agents in Massachusetts to discuss terms of the RRA (id. p. 4, ¶ E);

(iii)   Sent at least 30 e-mails to Aspen and its agents in Massachusetts concerning the RRA (id. p. 4, ¶ E);

(iv)    Directed at least 7 communications to Aspen and its agents in Massachusetts addressing the specifics terms of the RRA (Doyle Aff. Tabs);

(v)     Signed and sent key contract documents to Aspen in Massachusetts (id.); and

(vi)    Communicated its threat to sue Aspen in Massachusetts (id.).

Finally, the very contract at issue is expressly governed by the laws of Massachusetts. "While not conclusive, this contract provision further tips the scales in favor" of jurisdiction over F/V. See Ganis Corp. of Cal. v. Jackson, 822 F.2d 194, 198 (1st Cir. 1987).

### 3.     The "Gestalt" Factors Also Point To Jurisdiction

The final consideration in the minimum contacts analysis is whether the exercise of jurisdiction over the defendant would "offend traditional notions of fair play and substantial justice." Fairview Mach. & Tool Co., Inc. v. Oakbrook Int'l, Inc., 56 F. Supp. 2d 134, 140 (D. Mass. 1999) (citation and internal quotations omitted). The First Circuit answers this question by addressing five "gestalt" factors which "[i]n very close cases . . . may tip the constitutional balance." Id. As in Fairview, "[t]his is not a close case [but] even if it were, these considerations support exercise of jurisdiction in Massachusetts." Id.

---

[41]     For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002).

The <u>first</u> factor is the defendant's burden of appearing. "This factor is only meaningful" if the defendant can "demonstrate some kind of special or unusual burden." <u>Id.</u> F/V does not attempt to establish the existence of <u>any</u> burden, much less one that is somehow "special" or "unusual." The <u>second</u> factor is the forum state's interest in adjudicating the dispute. Massachusetts has a significant interest here. Aspen's principal place of business is Massachusetts and the RRA itself is governed by Massachusetts law. The <u>third</u> factor is "the plaintiff's interest in obtaining convenient and effective relief." <u>Fairview</u>, 56 F. Supp. 2d at 140. This factor also favors adjudication in Massachusetts. The First Circuit "has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." <u>Id.</u> at 140 (citation omitted). The <u>fourth</u> factor concerns the judicial system's interest in obtaining the most effective resolution of the controversy. <u>Id.</u> at 140 (citation omitted). This matter can be efficiently resolved in this Court. As stated above, Massachusetts is Aspen's principal place of business and home to many potential witnesses in the case. The close proximity of witnesses to the proceedings will only expedite the matter. The <u>fifth</u> factor concerns the interests of affected governments and does not apply here. <u>Id.</u>

## II.   <u>ALL DISCRETIONARY CONSIDERATIONS ARE SATISFIED</u>

F/V seeks to have this Court exercise its discretion and dismiss Aspen's Complaint notwithstanding Aspen's satisfying the jurisdictional prerequisites. While this Court certainly has such discretion, <u>see</u> <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 285, 286-91 (1995), it "is not unfettered . . . and must be exercised in accordance with the principles of the Declaratory Judgment Act and sound judicial administration." <u>Biogen, Inc. v. Schering AG</u>, 954 F. Supp. 391, 197 (D. Mass. 1996) (<u>cited at</u> F/V Mem. at 5-6, 11).

A.    **This Is The First-Filed Action**

A central principle guiding this Court's discretion is the First Circuit's "first-filed rule," which applies here because F/V has sued Aspen on identical grounds in the Eastern District of Louisiana:

> Where identical actions are proceeding concurrently in two federal courts . . . the first filed action is generally preferred in a choice-of-venue decision. The burden of proof rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice of forum.

Coady v. Ashcraft & Gerel, 223 F.3d 1, 11 (1st Cir. 2000). Further, the fact that this action is for declaratory judgment makes no difference; the first-filed rule applies "whether or not [the first action] is a declaratory action." GSI Lumonics, Inc. v. Biodiscovery, Inc., 112 F. Supp. 2d 99, 105 (D. Mass. 2000) (Young, C.J.) (cited at F/V Mem. at 12). As stated by another of the decisions relied upon by F/V:

> Nor can a district court dismiss a declaratory judgment action merely because a parallel patent infringement suit was subsequently filed in another district; to take such action without any other reasons, this court has held, would be contrary to the general rule favoring the forum of the first-filed action.

EMC Corp. v. Norand Corp., 89 F.3d 807, 813 (Fed. Cir. 1996) (cited at F/V Mem. at 4-5, 10).

B.    **This Is A Textbook Case For A Declaratory Judgment Action**

F/V claims that it is the "natural plaintiff" and thus should be permitted to bring suit wherever -- and presumably, whenever -- it chooses. See F/V Mem. at 6. Such a rule would eviscerate the Declaratory Judgment Act and is obviously not the law. To the contrary, as per another of F/V's own authority: "The purpose of the [Declaratory Judgment] Act is to enable a person who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other

17

side. It accommodates the practical situation wherein the interests of one side to the dispute may be served by delay in taking legal action." EMC v. Norand, 89 F.3d at 815.

In this case Aspen seeks judgment concerning the scope and meaning of one of the important contracts it uses in its ongoing business; a textbook example of the proper invocation of the Declaratory Judgment Act. See, e.g., United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 494 (4th Cir. 1998) ("The declaratory judgment action is designed to allay exactly the sort of uncertainty that flows from the threat that ambiguous contractual rights may be asserted."); Metro Transportation Co. v. Underwriters At Lloyd's Of London, No. 88-3325, 1989 WL 79778, *8 (E.D. Pa. July 7, 1989) ("The construction and interpretation of written instruments, including contracts, is the principal function of a declaratory judgment proceeding."). Indeed, F/V admits that "Declaratory Judgment properly is provided where the natural defendant in a potential legal controversy is injured by the 'uncertainty and insecurity' of a delay in its resolution." F/V Mem. at 9 (citations omitted). Precisely what is at issue here.

### C. F/V's Two Arguments Misstate The Governing Law And Ignore The Factual History Between The Parties

#### 1. The Promotion Of ADR

F/V claims that its August 11 request to negotiate a settlement precludes Aspen from bringing suit until after the parties have negotiated. F/V Mem. at 5-6. Its argument misstates the law, ignores the facts and is undercut by F/V counsel's own conduct.

First, courts that have dismissed declaratory judgment actions have done so only when there has been a showing of affirmative misconduct on the part of plaintiff. For example, one of F/V's cases specifically distinguished two other of F/V's cases on this very ground. See Biogen, Inc. v. Schering AG, 954 F. Supp. 391, 398-99 (D. Mass. 1996) (distinguishing Davox Corp. v. Digital Sys. Int'l, Inc. 846 F. Supp. 144 (D. Mass. 1993) on ground that "[w]hile Davox

18

represented that it was willing to resolve the matter, it in fact filed a pre-emptive action for declaratory judgment"; distinguishing EMC Corp. v. Norand Corp., 89 F.3d 807, 815 (Fed. Cir. 1996) on ground that defendant "had been lulled into deferring its possible suit based on EMC's representations regarding its interest in negotiating rather than litigating"). In another of the cases relied upon by F/V, GSI Lumonics, Inc. v. Biodiscovery, Inc., 112 F. Supp. 2d 99 (D. Mass. 2000), Chief Judge Young specifically held that "[t]he fact that [plaintiff's] action is for declaratory judgment does not bar the application of the first-filed presumption" because "[t]here is no allegation that [plaintiffs] made any representations that it would not sue during the intermittent negotiations." Id. at 105 (emphasis added). There is absolutely no showing -- nor could there be -- that Aspen misled F/V in any way about wanting to negotiate.

Second, F/V ignores the factual history. As described above, Aspen has been clear and consistent in its position that these claims are frivolous. Further, the language in F/V's August 11 letter is not the type which courts have found to constitute "demand letters that give specific warnings as to deadlines and subsequent legal action." Schnabel v. Ramsey Quantitative Systems, Inc., 322 F. Supp. 2d 505, 511-14 (S.D.N.Y. 2004) (citing numerous cases).

Third, it particularly ironic that F/V seeks to challenge Aspen's lawsuit here given that its own counsel in an earlier litigation secretly filed suit while the parties were in the midst of a settlement dialogue and then mislead opposing counsel after the fact.

## 2.    Forum Shopping

F/V's argument about forum shopping does not make sense because the parties have already agreed in the RRA that Massachusetts law applies, that the case will be tried in federal court and that there will be no jury. F/V's cases are therefore inapplicable. See Lexington Ins. Co. v. City of Phoenix, No. 96-10319, 1996 WL 463672, *2 (D. Mass. July 31,

1996) (cited at F/V Mem. at 6-7, 9) ("[T]he litigation ploy used by Lexington before this Court has but one practical goal -- avoiding an Arizona jury."); Hudson County News Co. v. Metro Assocs., Inc., 141 F.R.D. 386 (D. Mass. 1992) (cited at F/V Mem. at 9) (dismissing action where federal court would be "[s]natching this local commercial dispute from the province of the state judiciary"). Furthermore, Massachusetts has numerous contacts to this dispute: (1) the plaintiff and its witnesses are located in Cambridge, Massachusetts; (2) Hale and Dorr, the law firm which negotiated the RRA for Aspen, is located in Boston; (3) while it is true that there was one meeting in Louisiana, the negotiation of the RRA, took place between the law firms in Louisiana and Boston; (4) Aspen's performance of the RRA was conducted exclusively out of Massachusetts; and (5) the contract is governed under the laws of Massachusetts.

## Conclusion

For the foregoing reasons, Aspen Technology, Inc. respectfully requests that F/V motion to dismiss be denied.

## Request for Oral Argument

Pursuant to L.R. 7.1(D), Aspen Technology, Inc. respectfully requests oral argument on defendant's motion to dismiss.

Dated:    November 4, 2004
          Boston Massachusetts

Respectfully submitted

Thomas J. Dougherty (BBO #132300)
Justin J. Daniels (BBO # 656118)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 573-4800

Attorneys for Aspen Technology, Inc.

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by hand, on _____ .

20