UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASPEN TECHNOLOGY, INC.,<br>                Plaintiff,<br><br>v.<br><br>F/V SOFTWARE, L.L.C.,<br>                Defendant. | Civil Action<br>No. 04-11830 |

**REPLY MEMORANDUM OF F/V SOFTWARE, L.L.C.
IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant F/V Software, L.L.C. ("F/V") respectfully submits this Reply Memorandum and attached affidavit of Eugene G. Taggart to reply to plaintiff Aspen Technology, Inc. ("Aspen")'s Memorandum in Opposition to Defendant's Motion to Dismiss ("Aspen Memo").

**Preliminary Statement**

Aspen devotes a full half of its memorandum to an account of the course of its dealings with other parties to the Registration Rights Agreement ("RRA") and the *Benbow* litigation recently settled in the United States District Court for the Eastern District of Louisiana. Aspen Memo at 2-11. Aspen attempts to support its account with the self-serving affidavits of three of its attorneys, and Aspen includes an untrue and scurrilous attack on the actions of F/V's Louisiana attorneys when they represented the *Benbow* plaintiffs. Aspen's account is grossly erroneous and irrelevant. F/V has attempted to limit most of its response to Aspen's attack to the affidavit of Eugene G. Taggart, attached hereto as Appendix A. Additionally, F/V refers the court to the affidavit of David Erath, attached to F/V's original memorandum, and to the full text of Mr. Erath's deposition taken by Aspen in New Orleans that is included with Aspen's Opposition as Tab 27 to the affidavit of Stephen J. Doyle.

1

F/V does state that Aspen's account improperly conflates the actions of F/V and the *Benbow* plaintiffs, completely ignores Mr. Erath's testimony concerning the presentation to him shortly before *Benbow* trial of confidential documents produced by Aspen showing its ineligibility to register its stock as promised in the RRA, and falsely accuses F/V's Louisiana counsel of a "secret" lawsuit that was in fact fully communicated to Aspen at a time when Aspen's legal department was in disarray and which was filed, not for some nefarious purpose, but to interrupt the running of prescription. F/V also addresses Aspen's erroneous accusations to the extent they actually bear on the legal arguments offered by Aspen.

## Argument

**I.  Aspen has not demonstrated that the court should exercise its discretion to hear its complaint for declaratory relief.**

In an effort to persuade the court to exercise its discretion to hear its complaint, Aspen first argues that it is the first filed action. Aspen Memo at 17. Aspen cites *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000), but the court there expressly stated that it did not base its ruling on any application of the first filed doctrine. *Id*. at 10-11. The law is clear that the court must exercise its discretion to consider the propriety of a complaint for declaratory judgment even if it is first filed among competing lawsuits. *EMC Corp. v. Norand Corp.,* 89 F.3d at 807, 813 (Fed. Cir. 1996); *EMC Corp. v. Roland*, 916 F. Supp. 51, 53 (D. Mass. 1996)*; Davox Corp. v. Digital Systems International, Inc.,* 846 F. Supp. 144, 147 (D. Mass. 1993). As noted by this court in *Lexington Insurance Company v. The City of Phoenix, Arizona,* No. 96-10319*,* 1996 WL 463672, at *1 (D. Mass. July 31, 1996), "[t]he first-filed preference, of course, is not to be given great weight."

Aspen's argument begs the question. F/V has argued that Aspen's filing of its complaint in order to be first filed is inconsistent with important public policies identified by this court in

prior decisions. Aspen cannot point to its filing as justification for its filing. Aspen has identified not a single case where a complaint for declaratory judgment was considered by the court under circumstances such as are present here.

Aspen next argues that this is a "textbook case" for a declaratory judgment action and points to the use of the action in interpreting disputed contracts and avoiding damaging delay. Aspen Memo at 17-18. Aspen has not shown that its action was taken for either purpose.

Aspen and F/V do not dispute the meaning of the RRA. Aspen has not alleged that the contract has any ambiguities. It is only Aspen's past performance of that contract that is at issue, and the resulting damage to F/V. See Complaint for Declaratory Relief, Counts One and Two, ¶¶ 63-74. Aspen relies on *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488 (4th Cir. 1998), but that case involved an insurance policy with provisions alleged to be ambiguous and "[i]t is well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism." *Id*. at 494. Further, in that case the court specifically found that there was little evidence of forum shopping because the declaratory judgment plaintiff could have reasonably expected that any suit filed by the insured would have been removable to the court in which the declaratory judgment action had been filed. *Id.* Similarly, *Metro Transportation Co. v. Underwriters at Lloyd's of London*, No. 88-3325, 1989 WL 79778, *8 (E.D. Pa. July 7, 1989), cited at Aspen Memo at 18, was an insurance case with no contention that it was an abuse of the Declaratory Judgment Act.

For its "textbook case" Aspen cites no textbook, but F/V notes that Professors Wright and Miller, in describing the purpose of the Declaratory Judgment Act, state "[i]t permits actual controversies to be settled *before* they ripen into violations of law or a breach of contractual duty." 10B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and*

*Procedure* § 2751 (3d ed. 1998) (emphasis added) (citing, *inter alia*, *Gruntal & Co. v. Steinberg*, 837 F. Supp. 85, 89 (D.C.N.J. 1993)) (declaratory judgment is inappropriate solely to adjudicate past conduct). Here, Aspen asks this court to decide whether its past conduct in 2001 in failing to register F/V's stock was a breach of a contract.

Aspen refers to the RRA as "one of the important contracts it uses in its ongoing business," and argues that the declaratory judgment action is appropriate where "the interests of one side to the dispute may be served by delay in taking legal action." Aspen Memo at 18, quoting from *EMC Corp. v. Norand Corp.*, 89 F.3d at 815. Neither Aspen's complaint nor its opposition memorandum alleges any interference with its ability to contract or any pending business involving a Registration Rights Agreement, and Aspen has not shown how F/V "may be served by delay in taking legal action," within the meaning of *EMC v. Norand* or that any potential lawsuit by F/V was "likely to chill" Aspen's activities within the meaning of *Hudson County News Company v. Metro Associates, Inc.,* 141 F.R.D. 386, 391 (D. Mass. 1992).

Aspen claims that its declaratory judgment action was a "good faith business decision" with citations to the affidavits of its attorneys Doyle and Johnson. Aspen Memo at 10, n. 39. Mr. Johnson's affidavit says nothing about this decision, and Mr. Doyle only states that registration rights agreements are a key component of transactions for "potential acquisitions." Doyle affidavit at 4. Aspen refers to no pending matters and here, as in *Lexington Insurance Company, supra*, there is not a "scintilla of evidence" that some "investment decision or other business ramifications were claimed to turn on the outcome of this fairly routine dispute." *Id.* at *2.

Moreover, Aspen has received notice from the NASDAQ Stock Market that Aspen is "not in compliance with the NASDAQ requirements for continued listing set forth in

4

Marketplace Rule 4310(c)(14) as a result of [its] failure to file [its] Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2004 with the Securities and Exchange Commission." See Form 8-K filed by Aspen with the SEC on November 16, 2004, attached as Appendix B hereto. Aspen's alleged concern would be moot even if Aspen had some "potential acquisition" in mind.

     F/V did not delay in raising the issue of Aspen's apparent breach of the RRA once F/V learned of Aspen's ineligibility to do what it promised to do in the RRA. In August of 2001, at a time when Aspen was explaining its failure to register stock it had issued on June 15, 2001, by pointing to actions of the SEC, F/V had no interest in suing Aspen because of the cost. Dep. of D. Erath at 203, cited at Aspen Memo at 5. Mr. Erath and F/V were not even aware that the *Benbow* group had sued Aspen until he was subpoenaed to testify in that litigation shortly before trial. Dep. of D. Erath at 37. It was then that Mr. Erath and F/V learned that Aspen had produced confidential documents that showed that Aspen had been ineligible to register the stock on June 15, 2001. As stated in his affidavit, because the *Benbow* trial was imminent, Mr. Erath and F/V decided to await the outcome to see what was what, only to have the *Benbow* matter settled in confidence. It was then that F/V retained Taggart Morton and instructed it to contact Aspen to initiate some dialogue about F/V's potential claims. F/V has acted reasonably and with dispatch.

     Aspen's claim that it filed its complaint for declaratory relief not in response to F/V's letter prompted by the new situation created by F/V's new knowledge of Aspen's apparent breach, but in response to Aspen's uncertainty over its contractual rights, is spurious. Aspen knew of the potential claims of F/V for over three years, but waited until it got a letter from F/V, and then moved to sue in a favored forum. Further, Aspen has not sued to clarify the rights of

other parties who were issued stock on June 15, 2001, or who attended the meeting in August of 2001 that considered possible action in response to the delay in registration of their stock. Other parties to the Registration Rights Agreement could yet make claims. Aspen sued F/V and only F/V in direct response to its letter requesting discussion. Aspen has shown no injury to it from F/V's desire to avoid litigation.

In response to F/V's argument that Aspen's actions were contrary to the public policies enunciated by this court in *Davox Corp. v. Digital Systems International, Inc.,* 846 F. Supp. 144, 147 (D. Mass. 1993)*,* and subsequent cases, Aspen argues that there must be "*affirmative misconduct* on the part of plaintiff" to justify dismissal. Aspen Memo at 18 (emphasis in original). No such showing is required; instead, the court has "unique and substantial discretion in deciding whether to declare the rights of litigants," *Wilton v. Seven Falls Company,* 515 U. S. 277, 286 (1995) (adopting discretionary rather than "exceptional circumstances" test), and if a case does not serve the public policies of the Declaratory Judgment Act, the court should decline to hear it. Although this court can and should make the obvious inference that Aspen filed its suit to achieve a favored forum (see *EMC Corp. v. Roland*, 916 F. Supp. at 53 (making "fair inference" that suit was filed to preempt choice of forum)), it is enough that this court find that "to exercise its discretionary jurisdiction in this case would create 'an incentive structure that is inconsistent with the public interest in preserving declaratory proceedings for cases closer to the central objectives of declaratory proceedings.'" *EMC Corp. v. Norand Corp*., 89 F.3d at 810.

Aspen argues that it cannot be guilty of forum shopping because "the case will be tried in federal court and that there will be no jury." Aspen Memo at 19. Aspen asks the court to ignore the obvious: Massachusetts is a more favorable forum to Aspen where it and its chosen attorneys reside than Louisiana. Aspen also incorrectly suggests that prohibitions against the misuse of the

declaratory judgment action only come into play in federal versus state contexts. In the leading case *Davox Corp. v. Digital Systems International, Inc.,* 846 F. Supp. 144, 147 (D. Mass. 1993), the question was whether the case should be heard in federal court in Massachusetts or federal court in Washington, and no issue of jury trial was considered.

Aspen cannot dispute that F/V is the injured party, and Aspen does not address the condemnation of declaratory judgment actions by expected defendants in coercive actions to preempt the forum choice of the natural plaintiff as was found in *Hudson County News Co. v. Metro Associates, Inc.,* 141 F. R. D. 386, 392 (D. Mass. 1992) and cases cited therein.

Aspen has failed to even address the public policies forcefully enunciated in *Davox* and its progeny that suggest a party should consider extra-judicial resolution of potential disputes before filing a declaratory action in a favored forum. This case presents the policy question: Is a party that could easily assert its potential claim for damages for breach of contract in a forum of its choice in peril of losing that choice when it sends a letter to someone in the District of Massachusetts in an effort to avoid litigation? The overwhelming weight of authority protects and encourages such an effort.

**II.    Aspen has not demonstrated that at the time it filed its action, an actual controversy existed within the meaning of the Declaratory Judgment Act.**

In an attempt to demonstrate subject matter jurisdiction in this court, Aspen claims that when it received F/V's letter of August 11, 2004, Aspen had a "reasonable apprehension of…a lawsuit." Aspen Memo at 12. It bases this claim on the erroneous and scurrilous charge of "F/V's counsel's past practice of writing conciliatory letters while secretly bringing lawsuits," with citation to its own argument. *Id.* F/V shows in the attached affidavit of Eugene G. Taggart the utter nonsense of Aspen's charge. The lawsuit was not a secret, was in the hands of Aspen for six weeks prior to its filing, was filed to interrupt the running of one year prescription, and

7

was not served for another sixty days, and then was the subject of counsel's agreement that Aspen need not answer. Indeed, Aspen never answered that suit. Further, the lawsuit in question involved other parties and did not allege any breach of the RRA. F/V's counsel's conduct with respect to the initial lawsuit was impeccable and offers no justification for Aspen's violation of the public policies identified in *Davox* and its progeny. In addition to being wrong and contrived, Aspen's argument is irrelevant. Aspen's dispute is with F/V, not F/V's counsel.

Further, Aspen admits that F/V had previously decided not to consider litigation because of cost (Aspen Memo at 5), and Aspen does not discuss F/V's non-litigious nature as described in Mr. Erath's affidavit nor the fact that F/V was not even aware of the *Benbow* litigation until Mr. Erath was subpoenaed shortly before trial. Aspen does not discuss the confidential evidence of Aspen's ineligibility to perform the RRA that had been produced in the *Benbow* litigation and of which Mr. Erath testified he only learned shortly before the *Benbow* trial and which justified new discussion with Aspen.

In further effort to support its contention that it had a "reasonable apprehension" of a lawsuit when it received F/V's letter, Aspen states "the fact that Mr. Erath already indicated F/V's willingness to sue" again with citation to its own argument. Aspen Memo at 12. But at the cited page, Aspen quotes Mr. Erath as only saying "there is a possibility that we will take action" and that he was "not as aware of all of the facts" and that he had not "perused all of these documents." F/V's letter to Aspen after the *Benbow* litigation settled was F/V's attempt to have Aspen explain its position and documents to F/V so that F/V could properly evaluate its position. Aspen admits that it had no contact with F/V between the January 13, 2004 deposition of Mr. Erath and its receipt of F/V's August 11, 2004 letter requesting discussion. Aspen Memo at 9.

8

As its only other justification for its claim that there was an actual case or controversy when it received the F/V letter, Aspen points to its "open position that it considered these claims frivolous," and that "[t]his position had been communicated to F/V's counsel on numerous occasions." Aspen Memo at 11-12. F/V and its counsel are unclear as to the relevance of Aspen's argument, but they do note as a matter of public record that Aspen lost rule 12(b) and rule 56 motions to dismiss the *Benbow* contract claims, and eventually reached a settlement with and satisfactory to the *Benbow* plaintiffs. Further, while Aspen did communicate to F/V's counsel, while he was *Benbow* counsel, that Aspen denied everything, Aspen in fact communicated through word and deed in its conduct in the *Benbow* litigation that it was concerned about its exposure. Most importantly, while Aspen litigation counsel did formally deny any liability, Aspen had admitted on November 2, 2001 to the SEC in documents produced in the *Benbow* litigation that:

> Pursuant to registration rights agreements entered into with the former stockholders of two companies acquired by Aspen on June 15, 2001, Aspen is required to register for public resale the 562,455 shares issued to these stockholders as expeditiously as possible. As required by these agreements, Aspen filed the Form S-3 on June 15, 2001 in good faith, unaware that it technically was not then eligible for use of a Form S-3.

Exh. G to Affidavit of Eugene G. Taggart.

That letter also recited:

> In the event Aspen is unable to maintain its eligibility to use Form S-3 as a result of its technical non-compliance, significant harm will result to Aspen and Aspen's stockholders. *Id.*

Aspen later withdrew its June 15, 2001 registration of F/V's stock in a November 16, 2001 letter to the SEC stating:

> The Registrant is requesting withdrawal of the Registration Statement because it determined, after the date of the original

9

> filing of the Registration Statement, that it was not eligible to use Form S-3. No shares of the Registrant's common stock have been sold under the Registration Statement.

Exh. F to Affidavit of Eugene G. Taggart.

F/V is not clear if these communications are contemplated by Aspen's reference to its "open position," since they were produced under a confidentiality order in the *Benbow* litigation, but they were to the SEC and they were made available to Mr. Erath and F/V shortly before the *Benbow* trial. This was the "position" of Aspen that prompted F/V to retain *Benbow* counsel and to seek to open discussion with Aspen.

When Aspen received the August 11, 2004 letter from F/V, litigation was not inevitable. In its opposition, Aspen states "Aspen did not, and does not, believe settlement discussions would be fruitful *at this stage.*" Aspen Memo at 11 (emphasis added). It is not known what might have come of a good faith effort to discuss the potential claims of F/V prior to Aspen's filing of a complaint for declaratory relief. Mr. Erath states that, in his mind, F/V was open to "all possible resolutions of this matter." Affidavit of D. Erath at 5. Aspen's complaint was filed not because it had a reasonable apprehension of litigation when it received F/V's letter, but to obtain for Aspen the perceived benefits of a favored forum at some future "stage" of discussion.

Aspen's actions do not establish that there was an actual controversy at the time it chose to file its complaint for declaratory relief within the meaning of the Declaratory Judgment Act such that subject matter jurisdiction existed in this court. Aspen's desire to achieve tactical advantage in any future negotiations does not demonstrate an actual controversy. *See Hudson County News Co. v. Metro Associates, Inc., supra,* at 392; *EMC Corp. v. Norand Corp., supra*, at 815 (declaratory judgment complaint filed as tactical measure to improve posture in negotiations not a purpose of the Declaratory Judgment Act).

**III.     This court does not have personal jurisdiction over F/V.**

Aspen concedes that the court does not have general jurisdiction over F/V and that this court's analysis of specific jurisdiction in *Levin v. Harned*, 304 F. Supp. 2d 136 (D. Mass. 2003) controls. Aspen Memo at 13. Aspen further concedes that a contract does not automatically establish minimum contacts and that "'prior negotiations and contemplated future consequences, along with…the parties' actual counsel dealing'" [sic, "actual course of dealing"] is to be considered. *Id.* at 13-14. Aspen attaches a series of draft agreements exchanged between the parties in Louisiana and Massachusetts by e-mail and fax, but Aspen does not explain their relevance to its declaratory judgment action, which does not allege any dispute as to the confection of the contract or allege any ambiguity in its provisions.

Aspen makes no attempt to satisfy the "relatedness" element of the exercise of specific personal jurisdiction. "Specific personal jurisdiction can be asserted over a defendant only if: (1) the claim 'directly relates to or arises from the defendant's contacts with the forum'; and…" *Levin v. Harned*, 292 F. Supp. 2d 220, 225 (D. Mass. 2003). Aspen seeks a judgment from this court that Aspen's failure to register F/V's stock properly was not a breach of the RRA. See Complaint for Declaratory Relief ¶¶ 36-74; Exh. G to Affidavit of Eugene G. Taggart (Aspen letter dated November 2, 2001 to SEC acknowledging ineligibility to register stock on June 15, 2001) and Exh. F to Affidavit of Eugene G. Taggart (Aspen letter dated November 16, 2001 to SEC withdrawing June 15, 2001 registration). None of this directly relates to F/V's contacts with Massachusetts prior to the execution of the RRA, and Aspen does not even attempt to make a showing that it does.

Aspen repeats its recital of the contacts between the parties that led to the execution of the RRA in an attempt to meet the "purposeful availment of the benefits and protections afforded

by the forum's laws" requirement of specific personal jurisdiction analysis. Aspen Memo at 14-15. None of the cases cited by Aspen supports its argument, and they are indeed adverse to it.

In *JMTR Enterprises, L.L.C. v. Duchin*, 42 F. Supp. 2d 87 (D. Mass. 1999) cited at Aspen Memo at 14, it was not a "single telex" that the court held to be purposeful availment, but, instead, the court said:

> The First Circuit has held that sending a fraudulent misrepresentation into Massachusetts fulfills the "purposeful availment" requirement. Moreover, there is no constitutional problem in basing jurisdiction upon a single, isolated tort committed by a foreign defendant in Massachusetts against a Massachusetts resident. *Id*. at 98 (internal citation omitted).

Aspen does not contend that F/V's letter was fraudulent or that F/V committed any tort.

*Bond Letter Co. v. Q.T. Shoe Mfg. Co*., Inc., 764 F.2d 928 (1st Cir. 1985), cited at Aspen Memo at 14, is clearly adverse to Aspen. There the court found a single contract, even as a guarantee, did *not* constitute purposeful availment. The court said:

> The familiar constitutional inquiry focuses on whether M.N., Inc.'s contacts with Massachusetts were such that requiring it to defend a lawsuit there does not offend traditional notions of fair play and substantial justice. Centrally relevant to this question is whether the defendant has purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Applying these standards, we conclude that M.N., Inc.'s contacts are insufficient to satisfy the requirements of due process.
>
> We have held that the fact that a nonresident enters into a single commercial contract with a resident of the forum state is not necessarily sufficient to meet the constitutional minimum for jurisdiction. In *Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079 (1st Cir. 1973), we upheld jurisdiction over only one of three defendants who had contracted with a Massachusetts seller to purchase materials to be used in the manufacture of aircraft engines, because only that defendant had, in addition to entering into the contract, solicited, regularly visited and communicated with, and supervised the performance of, the plaintiff. We concluded that only that defendant could fairly be said to have

12

> "participate[ed] in the economic life of Massachusetts," *id.* at 1084, and could, therefore, be constitutionally made to defend a lawsuit there. *Id.* at 933 (some internal quotation marks and citations omitted).

F/V did not act to participate in the economic life of Massachusetts.

Finally, *Nova Biomedical Corp. v. Moller*, 629 F.2d 190 (1st Cir. 1980), cited at Aspen Memo at 14, is also adverse to Aspen's position. The court did not find purposeful availment in two letters charging patent infringement. The court held:

> By entering into the licensing agreement with Orion and visiting Massachusetts twice on related business, Moller has purposefully avail(ed) (him)self of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Id.* at 193 n. 3 (internal quotation marks and citation omitted).

F/V never visited Massachusetts on any business. In contrast, Aspen traveled to Louisiana to buy a Louisiana business, and Aspen has an office in Louisiana.

Aspen never addresses F/V's argument that the RRA never contemplated any on-going relationship or business in Massachusetts at all. The contract required Aspen to register F/V's stock on the day of the execution of the contract and "to cause such [r]egistration…to be declared effective by the Commission at the earliest practicable date." F/V contemplated no business in Massachusetts and did not purposely avail itself of the benefits and protections of its laws.

Aspen's "gestalt" analysis is flawed. Aspen first attempts to use its role as putative plaintiff in this declaratory judgment action to meet the gestalt factors identified in *Fairfield Mach. & Tool Co., Inc. v. Oakbrook Int'l, Inc.*, 56 F. Supp. 2d 134 (D. Mass. 1999). Aspen Memo at 15-16. But that case was a breach of contract case brought by the injured party, and the court was measuring the burden of making the purchaser of equipment defend in the state where

13

the equipment was manufactured, and then inspected by and delivered to the defendant.  In considering the gestalt factors in *Levin v. Harned*, 292 F. Supp. 2d 220, 229 (D. Mass. 2003), this court noted that an injured party is entitled to its choice of forum, and here the injured party is F/V.

In *Fairfield,* the court took into account the fact that the plaintiff was a "fairly small company" and "obviously would be severely inconvenienced by having to travel to Michigan to try this case."  56 F. Supp. 2d at 140.  Here, the true plaintiff is F/V, a fairly small company that would be severely inconvenienced by having to travel to Massachusetts to try this case.  In contrast, Aspen is a national corporation that actually has offices in the Eastern District of Louisiana, has previously litigated in Louisiana, and its Louisiana and Massachusetts attorneys have already made appearances in the breach of contract suit of F/V pending in Louisiana.

Perhaps the most compelling factor in this case identified in *Fairfield* is the "judicial system's interest in obtaining the most effective resolution of the controversy."  Here, the United States District Court for the Eastern District of Louisiana has already entertained litigation by other parties to the RRA against Aspen.  That case was set for trial when settled.  Recently that court transferred F/V's complaint to the judge who had handled the *Benbow* litigation.  As previously mentioned, Aspen has assembled the same litigation team in Louisiana to defend the F/V complaint as defended it in the *Benbow* litigation.  Aspen's dispute with F/V can be most economically and effectively resolved in the Eastern District of Louisiana, and this supports a finding by this court that it lacks personal jurisdiction over F/V.

**IV.     Conclusion**

For all these reasons, F/V respectfully requests this court to dismiss the complaint for declaratory relief.

> F/V SOFTWARE, LLC
>
> By Its Attorneys,
>
> /s/ Marc J. Goldstein
> Ruth T. Dowling (BBO #645568)
> Marc J. Goldstein (BBO #636228)
> PALMER & DODGE LLP
> 111 Huntington Avenue
> Boston, MA 02199
> (617) 239-0100
> Fax: (617) 227-4420
>
> Eugene G. Taggart, (LA Bar No. 12627)
> Terrence G. O'Brien, LA Bar No. 10147)
> TAGGART, MORTON, OGDEN, STAUB, ROUGELOT &
> O'BRIEN, LLC
> 1100 Poydras Street, Suite 2100
> New Orleans, LA 70163-2100
> (504) 599-8500
> Fax: (504) 599-8501